CHARLES D. TRAPHAGEN, APPELLEE, V. HARRY C. LINDSAY, REPORTER OF THE SUPREME COURT, ET AL., APPELLANTS.

FILED APRIL 17, 1914.   No. 18,522.

1. **Bureau of Printing**: DUTIES. By chapter 85, laws 1911, establishing a bureau of printing, all of the bookbinding and the printing of all stationery and supplies for the use of the state officers and the heads of the several departments of the state government are to be let by the commissioner of printing on contracts secured by competitive bidding, except in case of emergency, as provided by section 10 of that act.

2. ———: ———: SUPREME COURT REPORTS. Section 1146, Rev. St. 1913, is not in conflict with the provisions of the act establishing a bureau of printing. That section should be construed with the provisions of the act of 1911, and the supreme court reporter should cooperate with the commissioner of printing in letting the contract for publishing the supreme court reports.

3. **Commerce**: FOREIGN CORPORATIONS: STATUTORY PROVISIONS: CONTRACT FOR STATE PRINTING. A contract with a corporation doing

business in another state for publishing the supreme court reports of this state partakes of the nature of interstate commerce, and such foreign corporation may make a contract with the commissioner of printing in this state without complying with the provisions of section 725, Rev. St. 1913.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Reversed and dismissed.*

*Grant G. Martin, Attorney General, George W. Ayres* and *Frank E. Edgerton,* for appellants.

*Hall & Bishop, contra.*

BARNES, J.

Appeal from a judgment of the district court for Lancaster county, awarding the plaintiff an injunction enjoining Harry C. Lindsay, reporter of the supreme court, from delivering any of the manuscript opinions of the supreme court to the E. W. Stephens Publishing Company, of Columbia, Missouri, to be printed and bound, and William B. Howard, auditor of public accounts, from drawing or issuing any warrants for the publication of the reports of the supreme court, and Walter A. George, state treasurer, from paying any of said warrants. The defendants, and each of them, were also enjoined from performing a certain contract with the publishing company for the publication of ten certain volumes of the supreme court reports.

The record discloses that on the 11th day of February, 1914, one Charles D. Traphagen, filed his amended petition in the district court for Lancaster county, in which he alleged, in substance, that he was a resident and taxpayer of the city of Lincoln, county of Lancaster, and state of Nebraska, and has been such resident and taxpayer for more than 30 years last past; that on the 27th day of August, 1913, the state of Nebraska, through John H. Morehead, Governor, as commissioner of the printing bureau, entered into a contract with the E. W. Stephens Publishing Company, of Columbia, Missouri, at Lincoln, Nebraska, for printing, stereotyping, binding, and deliv-

ering ten volumes of the Nebraska supreme court reports, numbered 95 to 104, both inclusive. A copy of the contract was marked exhibit A and made a part of the petition.

It was alleged that the contract was illegal, null, and void, for the following reasons, to wit:

(1)   That the E. W. Stephens Publishing Company is a corporation organized and existing under and by virtue of the laws of the state of Missouri, with its office and principal place of business in Columbia, Missouri; that it has no office or place of business in the state of Nebraska, and was not engaged in business in this state at the time of making said contract, nor at this time; that the business of the company is the printing, binding, and publishing of books; that said corporation has not complied with the requirements of section 725, Rev. St. 1913, in that said corporation has not appointed a resident agent in this state upon whom service of process could be made, and has not filed a certificate signed by its president or secretary in the office of the secretary of state or register of deeds designating its principal place of business in this state, and has taken no steps giving it the right to do business in the state of Nebraska.

(2)   It was also alleged that under the provisions of chapter 65, Rev. St. 1913, the public printing in this state is required to be done by a competent printer doing business in this state; that the said E. W. Stephens Printing Company was not a competent printer doing business in this state, and had no right or authority to bid on the printing of the Nebraska supreme court reports, and the commissioner of printing had no right, power or authority to enter into a contract with the said E. W. Stephens Printing Company, of Columbia, Missouri, for the reason that it was a foreign corporation and a nonresident corporation, not doing business in this state; that the commissioner of printing had no right, power, or authority, under the statutes of this state, to deliver to the E. W. Stephens Printing Company the schedule or specifications for printing said Nebraska reports, for the reason that it was not a competent printer doing business in the state

of Nebraska, and said company could not bid upon said contract for the printing of said reports without a schedule or plans and specifications therefor; that the statutes of this state make it the duty of the reporter of the supreme court to prepare the opinions of said court for publication as fast as they are delivered to him, and, when sufficient material has accumulated to form a volume of not less than 900 pages, he shall cause the same to be printed, stereotyped and bound in a good and substantial manner; that said Harry C. Lindsay, as reporter of the supreme court, has now in his hands the manuscript opinions of said court for at least volume 95 of the Nebraska supreme court reports, which said manuscript will be delivered to said E. W. Stephens Publishing Company to be printed and bound in accordance with the terms of said contract; that the said E. W. Stephens Printing Company will begin the printing, binding and publishing of volume 95 of said Nebraska supreme court reports at Columbia, Missouri, unless enjoined from so doing by an order of this court, notwithstanding said contract is illegal and void; that no part of said contract has yet been performed.

(3) It was further alleged that William B. Howard, the auditor of public accounts, will draw warrants for the payment of said volumes as they are delivered to the state, under said contract, from time to time, unless enjoined from so doing by an order of the court; and the said Walter A. George, state treasurer, will pay said warrants when presented, unless enjoined and restrained from so doing; that the printing of said ten volumes of the Nebraska supreme court reports, and the payment for the same under said contract, would be illegal and void and in violation of law; that said contract will be performed and completed, unless defendants are enjoined from the performance of that part of said contract obligatory upon them; that the plaintiff is remediless in the premises, and has no adequate remedy at law.

The petition concluded with a prayer for a permanent injunction. To this petition the defendants demurred sep-

arately, on the ground that the petition did not state facts sufficient to constitute a cause of action against the said defendants, or any of them. The district court overruled the demurrers, the defendants each severally excepted, elected to stand upon their demurrers, and the court thereupon rendered its judgment awarding the injunction as above set forth. This appeal is prosecuted for the purpose of reversing that judgment.

The crucial question presented by this appeal is the right or power of the governor, as commissioner of the printing bureau, to enter into the contract in question, and that point will receive our first consideration.

The legislature, by chapter 85, laws 1911, created what is called a "State Printing Bureau," and provided that the governor should be the commissioner thereof. The commissioner was authorized to appoint a deputy, who, the act provides, "shall be a thorough, practical journeyman printer, and who shall attend to the preparing of all schedules and contracts, examine all bids and furnishing, and perform any detail work relating to stationery supplies and printing as the commissioner may direct," and, when acting for or instead of the commissioner, shall have and may exercise equal power and authority, subject to the approval of the commissioner.

Section 2 of the act provides: "On or before the 10th day of January, April, July and October of each year the commissioner of printing shall receive from the officers of each department of the government and state institutions an estimate of the probable amount and kind of stationery, blanks, blank books, circulars, folders, catalogues, pamphlets, reports and all other stationery or printed matter required by law or that may hereafter be required by law to be contracted for for said state offices and state institutions."

The act further provides that, within 20 days thereafter, the work shall be bid on separately, and the contract awarded to the lowest and best bidder; the commissioner reserving the right to reject any or all bids. The act also provides for the publication of a notice for five consecu-

tive times in three different daily newspapers in different parts of the state, asking for bids, and fixing the day and hour for closing the time when they shall be received.

Section 4 of the act provides for the preparation of a blank schedule, upon which all bids shall be made, specifying the size, weight and quality of paper to be used, the size and style of type, the quality and style of binding, etc. It is also provided that, when required so to do, the commissioner shall furnish any competent printer doing business in the state a copy of the blank schedule.

Section 5 of the act provides, in substance, that the successful bidder shall receive notice of the acceptance of his bid, and he is required, within five days thereafter, to enter into a contract with the state to furnish the same in accordance with the schedule and specifications.

Section 6 provides that the attorney general shall draw all contracts let under the provisions of the act; that each contract shall be signed by the commissioner and by the party to whom the contract has been awarded; and the contract thereafter shall be filed in the office of the commissioner.

By section 10 it is provided: "All stationery supplies and printing of every kind for any state officer, institution or organization not herein enumerated shall pass through the hands of and shall be purchased by the commissioner in the same manner as herein provided. Except, however, when an emergency arises for the immediate furnishing of any stationery supplies or printing, the cost of which shall not exceed the sum of twenty-five (25) dollars, the commissioner shall have the power, if, in his judgment, the same cannot be deferred, to furnish said stationery supplies or printing at the lowest and best competitive price, at any time between the date fixed in section 2 of this act, for the letting of contracts."

The act concludes with a repealing clause, which reads as follows: "All laws and sections in conflict herewith are hereby repealed."

By the provisions of the act above mentioned it is apparent that it was the purpose and intention of the legis-

lature to require the printing bureau to furnish all neces-
sary printing, bookbinding, and the printing of all sta-
tionery and supplies for the use of the state officers and
the heads of the several departments of the state govern-
ment by contract, based on competitive bidding, and we
are of opinion that by the terms of the act, when properly
construed, that purpose was accomplished.

It is contended, however, that the act is in conflict
with section 1146, Rev. St. 1913, by which it is provided:
"It shall be the duty of the reporter of the supreme court
to prepare the opinions of said court for publication as
fast as they are delivered to him, and, when sufficient
material is accumulated to form a volume of not less than
nine hundred pages, he shall cause the same to be printed,
stereotyped, and bound in a good and substantial man-
ner."

It is argued that by the section above quoted the supreme
court reporter is unlimited in his power to discharge that
duty, and that it is nowhere provided that he is compelled
to let the contract therefor to the lowest bidder, or to
advertise for printing and binding the reports, and that
he has full power to let the contract for so doing to any
person or corporation he may see fit. We think this con-
tention is unsound. It is our opinion that this section
ought to be construed with the provisions of the act estab-
lishing the bureau of printing, and that, when so con-
strued, it is the duty of the reporter of the supreme court
to notify the commissioner when he has a sufficient amount
of manuscript to make a volume of the supreme court re-
ports, and cooperate with him in letting the contract for
the printing, stereotyping and binding of the report or
reports, as the case may be, on a competitive bid, to the
person or corporation making the lowest and best bid for
that purpose. We therefore hold that the contract in
question comes within the jurisdiction of the printing
board, and, unless the E. W. Stephens Printing Company
was incapable of contracting with the commissioner, the
contract was properly awarded to that company.

It is plaintiff's contention, however, that the E. W. Stephens Printing Company could not make a valid contract with the commissioner of the printing bureau, because, being a nonresident corporation, neither the commissioner nor his deputy was required to furnish it with a schedule on which it could bid for printing the supreme court reports. That contention is based on the provision that the commissioner or deputy shall furnish a blank schedule to "any competent printer doing business in the state." The expression "doing business in the state," as we view it, means that any person or corporation having a place of business in another state who comes into this state and solicits business by which it is to furnish any article of commerce or any manufactured article which is made in whole or in part at its place of business in another state, and which is to be furnished, sold or delivered to the purchaser in this state, is, in a comprehensive sense, doing business in this state. There is nothing in the statute prohibiting the commissioner or his deputy from furnishing such firm, person or corporation the blank or schedule on which to bid for doing the work in question herein, and we think that this contention is without merit.

It is finally contended that the E. W. Stephens Printing Company, having failed to comply with the provisions of section 725, Rev. St. 1913, by filing with the secretary of state a certificate setting forth the name of some resident agent on whom service of summons could be made, and also designating its principal place of business in this state, was unable, as a matter of law, to enter into the contract with the commissioner of the printing bureau. By the contract, the governor, as commissioner of the bureau of printing, was to furnish the copy for printing ten volumes of the supreme court reports from time to time to the E. W. Stephens Printing Company, and the company was required to furnish the paper, the binding, and do the work necessary to publish the reports in question, at its place of business in Columbia, Missouri, and as fast as the work was completed was to deliver the reports (the finished product), together with the stereotyped plates of each volume,

at the vault in the basement of the capitol building at Lincoln, Nebraska, there to be stored under the direction of the reporter of the supreme court. That this was interstate commerce seems clear, and therefore the section of the statute above referred to could not affect the contract in any manner whatsoever. An act of the legislature of a state which imposes limitations upon the power of a corporation, created under the laws of another state, to make contracts within the state for carrying on commerce between the states, violates that clause of the constitution of the United States which confers upon congress the exclusive right to regulate interstate commerce. *Cooper Mfg. Co. v. Ferguson*, 113 U. S. 727; 7 Cyc. 445, 446; *Hargraves Mills v. Harden*, 56 N. Y. Supp. 937; *Coit & Co. v. Sutton*, 102 Mich. 324; *International Trust Co. v. Leschen & Sons Rope Co.*, 41 Colo. 299; *State v. American Book Co.*, 69 Kan. 1, 1 L. R. A. n. s. 1041.

As we view the facts stated in plaintiff's petition, he was not entitled to an injunction, for the various reasons set forth in this opinion. The judgment of the district court is therefore reversed, and the plaintiff's action is dismissed.

REVERSED AND DISMISSED.

ROSE, J., not sitting.

FAWCETT, J., dissenting.

I am unable to concur in the opinion. Section 4, ch. 85, laws 1911, provides: "The commissioner shall prepare a blank schedule, upon which all bids shall be made, enumerating the probable number, kind, form, style, size and quality of each article; the size, form, weight and quality of paper to be used. The size and style of type, the quality and style of binding design or monogram, and all other details entering into and forming a part of the goods to be furnished, and, when requested so to do, shall furnish any competent printer doing business in the state a copy of said blank schedule. Each bid shall be made in accordance with the schedule and specifications, and shall be accompanied by a bond, with two or more sureties to be approved

by the board, equal in amount to the aggregate sum of his bid, that in the case of the party proposing for any such supplies or work shall be awarded the contract it shall be holden for his faithful performance of the same." As I construe this section, it clearly shows that the legislature had in mind the letting of contracts for public printing to parties actually doing the business of printing in the state. If the intention was that "any competent printer" should, upon request, be furnished a schedule, it would have been easy to have said so; but the legislature saw fit to add to the words, "any competent printer," the words, "doing business in the state." We cannot assume that these words were simply "thrown in." The legislature must be presumed to have intended that the words used should be given effect. What does "doing business in the state" mean? Does it mean that a corporation actually doing business in another state—that is to say, doing all of its printing and binding and furnishing of material in that state, and transacting no business in this state except to enter into a contract, deliver its work, and collect its pay— is doing businss in this state? I do not think such was the legislative thought, nor that such is the meaning of the language which the legislature used. I do not think the question of the right of the E. W. Stephens Printing Company to enter into the contract by reason of its having failed to comply with the provisions of section 725, Rev. St. 1913, cuts any figure in this case. The question here is not whether that company had a right to make a contract of this kind, or whether the business contemplated by the contract is or is not interstate commerce. The question here is: Had the commissioner of printing of this state a right to enter into this contract? If not, then the injunction issued by the district court is proper, and the judgment of that court should be affirmed. The reasons why the legislature never intended that contracts of this kind should be made with nonresidents are many. State pride may have been one reason. The legislative thought may have been that the state ought to patronize some of the many strong and competent printing establishments within

its own borders; or the thought may have been in the minds of the legislature that it would be humiliating to the state, in the event that one with whom a contract of this kind might be made should fail to comply with his contract by supplying the printed volumes within the time contracted for, and the state should desire to compel it to do so by mandamus or otherwise, it would be compelled to institute such proceedings in the courts of a foreign state. Other illustrations could be given, but the two are sufficient for my purpose.

Without further discussion, it seems to me very clear that the commissioner of printing had no authority under the law to let the contract in controversy.